UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HUGH DAREN HALL,

    Plaintiff,

v.                                    Case No: 8:22-cv-0914-KKM-AAS

TARGET CORPORATION,

    Defendant.
_____

## ORDER

Hugh Daren Hall is suing Target for negligence after he slipped and fell at Target's Largo location. Compl. (Doc. 1-1). Target moves to prevent two of his experts from testifying at trial. Mot. to Strike BiFulco (Doc. 43); Mot. to Exclude Janson (Doc. 44). The first, Dr. Santo Steve BiFulco, is an expert in life care planning who will testify as to Hall's future medical costs resulting from his fall. The second, Christopher E. Janson, is a safety expert who will testify as to hazards in commercial settings. Because Target's bases for striking and excluding BiFulco have no merit, the first motion is denied. But because some of Janson's suggested testimony is improper, Target's second motion is granted in part.

I. BACKGROUND

Hall slipped and fell walking into Target on a rainy day in 2021. Statement of Facts (Doc. 50) ¶¶ 1–3; Plaintiff's Notice (Doc. 59) ¶ 2. Security camera footage shows Target employees wiping down carts and staging them on the laminate flooring inside the entrance for at least 30 minutes before Hall fell. Statement of Facts ¶ 2; Surveillance Video (Doc. 53-1). Footage also shows that one of the carts was taken from where employees were staging them and abandoned near the place where Hall fell, where it sat for about ten minutes. Surveillance Video. It was moved about ten minutes before Hall slipped. Hall alleges that he slipped on clear (not dirty) water, which he assumes was rainwater that dripped from one of the carts. Statement of Facts ¶¶ 1, 5; Plaintiff's Notice ¶ 3.

Upon the close of discovery, Target moves for summary judgment and to exclude two of Hall's experts. MSJ (Doc. 45); Mot. to Strike BiFulco; Mot. to Exclude Janson.

II. LEGAL STANDARDS

Federal Rule of Evidence 702 governs expert testimony. A court should admit expert testimony if the proponent of that testimony establishes the following:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated by *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (footnote omitted). The Rule permits a qualified witness to give opinions as an expert, provided that the opinions have a sufficient basis in facts or data, are derived from reliable principles or methods, and are helpful to the jury. *See* Fed. R. Evid. 702. Because "expert testimony may be assigned talismanic significance in the eyes of lay jurors," the "courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004). Thus, federal courts are the "gatekeepers" of expert testimony, screening out unreliable opinions. *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 n.13 (1993)). The party seeking to introduce the expert at trial bears the burden of establishing qualification, reliability, and helpfulness. *Frazier*, 387 F.3d at 1260.

Expert testimony generally helps the trier of fact to understand evidence or decide a fact at issue if the testimony "concerns matters that are beyond the understanding of the average lay person." *Id.* at 1262. Expert testimony generally will not help the trier of fact if it "offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262–63. And, of course, simply because expert testimony meets the *Daubert* standard does not mean that the testimony is automatically admitted. *See id.* at 1263. Instead, courts must still consider whether that expert testimony satisfies the other Federal Rules of Evidence. *See id.*

3

Additionally, Rule 26(a) requires that a party disclose "the identity of any witness it may use at trial to present" expert testimony. FED. R. CIV. P. 26(a)(2)(A). The party must also provide a "written report" containing, in relevant part, a "complete statement of all opinions the witness will express," as well as the basis for those opinions and facts considered in forming them. FED. R. CIV. P. 26(a)(2)(B). A party that does not comply with Rule 26(a) "is not allowed to use that information or witness to supply evidence . . . , unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1).

## III.   ANALYSIS

Target moves to prevent the testimony of BiFulco and Janson. It argues that Hall failed to properly disclose BiFulco as a treating physician, so he should be stricken under Rule 37. Mot. to Strike BiFulco at 8–9. Additionally, Target argues that BiFulco's methodology is unreliable, so he should be excluded. *Id.* at 12–15. Regarding Janson, Target argues that he is unqualified because he "could not identify any situations where he dealt with water dripping off a shopping cart," his testimony amounts to speculation not rooted in any methodology, and his opinions are unhelpful to the jury. Mot. to Exclude Janson at 11, 13, 16.

### A. Motion to Strike and Exclude BiFulco

Hall retained BiFulco to "independently evaluate [Hall] and determine, within [BiFulco's] capacity as a physician, who is also a board certified life care planner, . . . what

4

his condition is and what he will need going forward in the future." BiFulco Dep. (Doc. 54-1) at 9:24–10:6. BiFulco prepared a life care plan for Hall, which is a "detailed report that identifies the needs and services, both medical and non-medical, of an individual who is chronically ill over their lifetime." BiFulco Report (Doc. 54-3) at 4.

In preparing the life care plan, BiFulco reviewed Hall's medical records and interviewed and evaluated Hall in his office. Because of this in-person evaluation, Hall signed a "consent to treatment" form. BiFulco Dep. at 10:8–12; Consent (Doc. 43–11). BiFulco also relied on "appropriate medical and other health related information, resources, and personal [and] professional expertise" to "assess the impact [of Hall's] disabling conditions . . . and the extent to which they direct the need for medical and rehabilitation intervention." BiFulco Report (Doc. 54-3) at 4. He then determined the costs of those interventions using "a consistent method . . . [including] when applicable, available, or helpful in providing clarity, classification systems" like CPT coding. *Id.*

Target objects to BiFulco's testimony for two reasons. First, Target argues that BiFulco was not disclosed as a treating physician, so he should be stricken under Rule 37. Target points to the consent to treat, heavily redacted records from Hall's visits with BiFulco, and BiFulco's deposition testimony as evidence that BiFulco treated Hall.

As an initial matter, Target does not establish BiFulco is a treating physician. During the deposition, BiFulco never indicates that he treated Hall or intends to testify as

5

a treating physician. Instead, he testified that he "is a physician who happens to be also board certified as a life care planner," BiFulco Dep. at 6:12–13, and that he is "not a treating physician," *id.* at 13:13. Additionally, though it appears that BiFulco may have made some recommendations to Hall regarding therapy and exercise, and given him a prescription for weight loss medication, the unredacted records mostly memorialize BiFulco's examinations of Hall and the treatment provided by other doctors. Records (Doc. 54–2). Finally, the consent appears to be a boilerplate consent to treatment and examination, as well as an authorization to release information and acknowledgment of privacy practices. *See* Consent. The consent does not suggest that any treatments were ever performed after Hall signed it. Therefore, the Court is unconvinced that BiFulco is a treating physician.

But even if BiFulco provided some treatment to Hall, this does not amount to a reason for striking BiFulco's testimony as to life care planning. Target argues that BiFulco should be "excluded from providing testimony as a treating physician at trial or from relying on his alleged treatment [of Hall] to form the basis of any of his life care planner-type opinions" because Hall did not disclose him under Rule 26(a)(1) as a treating doctor. Mot. to Strike BiFulco at 10. But Hall does not purport to offer BiFulco as a treatment witness, and nothing in BiFulco's report suggests that his expert opinion was based on treatment he provided. Hall disclosed BiFulco as an expert in life care planning, the subject he will testify on. Failure to disclose information regarding some treatment BiFulco may have

6

provided could amount to grounds for preventing him from testifying as to that treatment (assuming such failure was not substantially justified or harmless), but it provides no basis to prevent his testimony on subjects for which he was properly disclosed. *See, e.g.*, *In re Denture Cream Prods. Liab. Litig.*, No. 09-2051-MD; 2012 WL 5199597, at *4 (S.D. Fla. Oct. 22, 2012) (Altonaga, J.) ("A treating physician may be subject to Rule 26(a)(2)(C) as to portions of his or her testimony and may be deemed a retained or specially employed expert who is subject to Rule 26(a)(2)(B) as to other portions."); *Daberkow v. U.S.*, No. 06-cv-1282, 2008 WL 4755852, at *5–6 (D. Colo. Oct. 29, 2008) (preventing treating doctors from testifying as to expert opinions when plaintiff failed to disclose them as experts, but allowing testimony as treatment witnesses). Thus, because BiFulco was properly disclosed under Rule 26(a)(2) as an expert on the topic on which he will testify, the Court will not preclude BiFulco's testimony on life care planning under Rule 37.

Though he did not rely on any treatment he may have provided to Hall, BiFulco's report indicates that he relies on an "Interview and Physical Examination of Hugh Hall on June 14, 2022." BiFulco Report at 4. Target does not argue that BiFulco's late disclosure of his examination notes (as opposed to treatment notes) merits striking his testimony. To the extent that Target's motion can be construed to make this *separate* argument, the motion is denied because any failure to turn over turn over these examination records appears harmless. *See* FED. R. CIV. P. 37(c)(1). "A failure to timely make the required

7

disclosures is harmless when there is no prejudice to the party entitled to receive the disclosure." *Hewitt v. Liberty Mut. Grp.*, 268 F.R.D. 681, 683 (M.D. Fla. 2010) (Baker, Mag. J.). The records include a summary of Hall's medical history and the injuries Hall reports the incident caused. This information is cumulative of Hall's deposition, in which he describes the same injuries. *Compare* Records at 2, 5 (summarizing headaches, shoulder mobility, foot sprain), *with* Hall Dep. (Doc. 53-4) at 14, 23–25, 51 (describing headaches, shoulder mobility, foot sprain), and the medical records that BiFulco's notes purport to summarize. Additionally, unlike treatment records, which Target argues it "could not serve a subpoena to get . . . because it had no way of knowing they existed," Mot. to Strike BiFulco at 9, Target was aware that an examination occurred as early as November 2022, when BiFulco's report was disclosed. R. 26(a)(2) Disclosures (Doc. 43-4 at 2, 4); BiFulco Report at 4. Had Target wanted these records in time for its own expert's deposition, it could have requested them then. Thus, the Court will not exclude the portions of BiFulco's testimony that rely on his evaluation notes.

Second, Target argues BiFulco's methodology is unreliable, and he therefore should be excluded under *Daubert*. Mot. to Strike BiFulco at 14. Target points out that BiFulco's conclusions "are not supported by or based on any recommendations by Plaintiff's treating physicians." *Id.* Target also assumes, without support, that the fact that BiFulco's conclusions as to what treatments Hall will require do not match the conclusions of other

8

physicians means that BiFulco is "trying to backdoor his alleged treatment of the Plaintiff." *Id.* It argues that "otherwise he has no support for those opinions." *Id.*

But whether Hall's treating physicians agree with BiFulco's conclusions goes to the weight, not the admissibility of those conclusions. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). And that other physicians may disagree with BiFulco's *conclusions* does not mean the *method* by which BiFulco came to those conclusions is unreliable. Target points to no other reason this method is unreliable, and the Court sees none. "[C]ourts routinely recognize that life care planners may be qualified to provide testimony as to future care of injured patients, and the cost of such care." *M.D.P. v. Middleton*, 925 F. Supp. 2d 1272, 1275 (M.D. Ala. 2013) (Albritton, J.). Here, BiFulco explains in his report that he relies on his knowledge as a physician, including "appropriate medical and other health related information, resources, and personal [and] professional expertise" to "assess the impact [of Hall's] disabling conditions . . . and the extent to which they direct the need for medical and rehabilitative intervention." BiFulco Report at 4. He then determines the costs of those interventions using "a consistent method . . . [including] when applicable, available, or helpful in providing clarity, classification systems" like CPT coding. *Id.* Therefore, the Court will not exclude BiFulco as an expert.

### B. Motion to Exclude Janson

Hall retained Janson to "provide a safety analysis and determine if there were conditions that would be considered defective [or] unreasonably dangerous." Janson Report (Doc. 52-3) at 1. Target attacks Janson's testimony as "various unsupported *ipse dixit* opinions." Mot. to Exclude Janson ¶ 5. Target's main contention is that Janson plans to testify as to an "abandoned cart theory," which would hypothesize that Target employees were not fully wiping down the carts before they placed them on the tile and that one of those carts dripped, causing Hall's slip. *Id.* ¶ 6, 13. Target contends that this testimony fails all three *Daubert* prongs. Janson's report, however, proffers more than this single opinion. Instead, it posits six general opinions, some of which the Court will preclude him from testifying about.

As an initial matter, Janson is clearly qualified to testify on matters of safety in a commercial setting. He is a board certified safety professional and is "active in consensus standards making committees that deal with slip, trip, and fall prevention." Janson Report at 1. Target argues that he is not qualified because he did not "identify any situations where he dealt with water dripping off a shopping cart" or "inclement weather hazards from rain in the retail setting." Mot. to Exclude Janson at 11–12. But Target's demanded standard is too specific. *See Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007) (Fawsett, C.J.) ("An expert is not necessarily unqualified simply

10

because [his] experience does not precisely match the matter at hand." (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)). Janson's curriculum vitae and report demonstrate that he has experience with hazard prevention in retail and work environments, whether they be related specifically to inclement weather or shopping carts. Janson Report at 1; Janson CV (Doc. 52-2).

Now moving to Janson's specific opinions. First, his opinions that "[w]et floors can be a slip and fall hazard" and that "[w]hile walking, pedestrians look towards their objective, not directly in front of their feet, unless something draws their attention to that area," go to standards of care in the industry. *Id.* at 4. This is acceptable testimony for a safety expert. Janson's report compares the incident to Target's policies and procedures and to industry publications on safety standards in similar environments. *Id.* at 2–3. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999) (noting that "experience-based testimony" methods that are "generally accepted in the relevant engineering community" may be reliable). Therefore, these opinions are also based on a reliable methodology. Safety standards in the industry are also helpful to the jury, which must determine whether Target breached its duty of care in this negligence case.

Some of Janson's proffered opinions, however, go beyond standards of care in the industry, to factual and legal conclusions that are pure speculation or are unhelpful to the jury. For example, Janson testified in his deposition that it was his opinion that the video

footage showed a wet floor. Janson Dep. (Doc. 52-4) at 31:9–13. This opinion is not supported by a proper methodology and is not helpful to the trier of fact. *See e.g.*, *Jay v. Royal Caribbean Cruises Ltd.*, 608 F. Sup. 3d 1249, 1258, 1260 (S.D. Fla. 2022) (Damian, Mag. J.) (finding that expert's opinion that the floor was wet based on review of security footage was neither based on reliable methodology nor helpful to the jury). The jury can come to its own conclusion as to whether the video depicts water on the floor.

For the same reason, Janson's opinion that "[n]o visual cues or warnings were present to direct Mr. Hall's attention to the wet floor," Janson Report at 4, is unhelpful to the jury. As already discussed, Janson may testify as to the accepted practice in the industry and his professional opinion regarding the need for visual cues, but the jury will be able to watch the video itself to determine whether such cues or warnings were present.

Janson also opines that the wet floor "existed for an extended period of time." But Janson provides no methodological support for this conclusion, and has no first-hand knowledge as to the length of time that the floor was wet.

Finally, Janson's testimony regarding notice and causation is impermissible. Janson plans to testify that "Target Corporation knew [or] should have known of the dangerous condition." Janson Report at 4. He also plans to testify that "[t]he slip and fall of Mr. Hall was caused by the defective and unreasonably dangerous condition of the wet floor." *Id.* Both of these opinions are impermissible legal conclusions. *See Montgomery v. Aetna Cas.*

& *Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) ("An expert may not . . . merely tell the jury what result to reach [or] testify to the legal implications of conduct."); *Zarfaty v. Garden Fresh Rest. Corp.*, No. 15-cv-60268, 2019 WL 8810306, at *3 (S.D. Fla. Oct. 30, 2019) (Bloom, J.) (holding expert cannot testify "with respect to Defendant's notice, either actual or constructive" because that "would be telling the jury the specific result it should reach"). These opinions are also speculative. Hall can testify as to dangerous conditions in workplaces generally created by hazards like water and carts. But he cannot connect that knowledge to Hall's fall. Janson has no way of showing that *these carts* were improperly dried, and he points to no methodology by which he can show how long the water was on the floor, whether the carts were wet when employees wiped them, or whether they dripped where Hall fell. Thus, any testimony as to these conclusions is precluded.

To summarize, Janson may testify as to standards of care in the industry, but he may not testify as to whether or how long the floor was wet, whether visual cues existed, whether Target caused Hall's fall, or whether Target had actual or constructive notice of water on the floor.

## IV.   CONCLUSION

BiFulco's testimony is permissible, but Janson's is impermissibly speculative in many ways and not helpful to the trier of fact. Accordingly, the following is **ORDERED:**

1. Target's Motion to Strike BiFulco (Doc. 43) is **DENIED.**

13

2. Target's Motion to Exclude Janson (Doc. 44) is **GRANTED IN PART**.

3. Hall's Request for Oral Argument (Doc. 58) is **DENIED as moot.**

4. Hall's Motion for Evidentiary Hearing and Oral Argument (Doc. 56) is **DENIED as moot.**

**ORDERED** in Tampa, Florida, on July 21, 2023.

*Kathryn Kimball Mizelle*
Kathryn Kimball Mizelle
United States District Judge